1
 2026 CO 8 Demarea Deshawn Mitchell, Petitioner: v. The People of the State of Colorado. Respondent: No. 24SC122Supreme Court of Colorado, En BancFebruary 2, 2026
          ADVANCE
 SHEET HEADNOTE
 
 
          In this
 case, the supreme court granted certiorari to consider
 whether the court of appeals division below erred in
 affirming the trial court's denial of the defendant's
 motion to dismiss for selective prosecution in a case in
 which the defendant, who is Black, and his three codefendants
 were all charged with felony murder, but only the two
 non-Black defendants received a plea bargain offer that
 allowed them to be tried in juvenile court in exchange for
 their cooperation with law enforcement.
 
 
          The
 court now concludes that the defendant did not establish that
 he was entitled to dismissal based on a claim of selective
 prosecution because he did not establish the requisite
 discriminatory effect or discriminatory purpose by the
 People. Specifically, he was not similarly situated to his
 non-Black codefendants because, unlike them, he was the one
 who confronted, shot, and killed the victim.
 
 2
 
 Nor did the statistical evidence that he provided establish
 grounds for dismissal based on a claim of selective
 prosecution.
 
 
          Accordingly,
 the court affirms the division's judgment.
 
 
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 21CA1676
 
 
          
 Attorneys for Petitioner: Henson Law, LLC Patrick R. Henson
 Denver, Colorado
 
 
          
 Attorneys for Respondent: Philip J. Weiser, Attorney General
 Brenna A. Brackett, Assistant Attorney General Denver,
 Colorado
 
 
           CHIEF
 JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD, JUSTICE
 SAMOUR, and JUSTICE BERKENKOTTER joined.
 
 3
 
          
 OPINION
 
 
          
 GABRIEL, JUSTICE
 
 4
 
          ¶1
 We granted certiorari to consider whether the court of
 appeals division below erred in affirming the trial
 court's denial of Demarea Deshawn Mitchell's motion
 to dismiss for selective prosecution in a case in which
 Mitchell, who is Black, and his three codefendants were all
 charged with felony murder, but only the two non-Black
 defendants received a plea bargain offer that allowed them to
 be tried in juvenile court in exchange for their cooperation
 with law enforcement.
 
 
          ¶2
 We now conclude that Mitchell did not establish that he was
 entitled to dismissal based on a claim of selective
 prosecution because he did not establish the requisite
 discriminatory effect or discriminatory purpose by the
 People. Specifically, he was not similarly situated to his
 non-Black codefendants because, unlike them, he was the one
 who confronted, shot, and killed the victim. Nor did the
 statistical evidence that he provided establish grounds for
 dismissal based on a claim of selective prosecution.
 
 
          ¶3
 Accordingly, we affirm the judgment of the division below.
 
 
          I.
 Facts and Procedural History
 
 
          ¶4
 The evidence developed by law enforcement prior to trial in
 this case tended to establish the following facts:
 
 
          ¶5
 In the spring of 2019, Mitchell and his three codefendants,
 Kenneth Gallegos, J.S., and D.S., all of whom were then
 juveniles, conspired to rob the
 
 5
 
 victim of vaping products. During the incident, Mitchell shot
 the victim in the chest, ultimately causing his death.
 
 
          ¶6
 J.S., a Hispanic female, initially planned the robbery with
 Gallegos, a Black male, whom she was dating at the time.
 Gallegos apparently disliked the victim because the victim
 was best friends with J.S.'s ex-boyfriend.
 
 
          ¶7
 On the day of the planned robbery, Gallegos called D.S. to
 see if he could borrow a gun that D.S. had in his possession.
 Gallegos told D.S. that he needed the gun because he was
 intending to rob the victim of some vaping products. Gallegos
 then picked D.S. up in J.S.'s car. D.S. brought the
 loaded gun with him.
 
 
          ¶8
 Later that afternoon, Gallegos and D.S. called Mitchell to
 see if he wanted to hang out for a while. He said that he
 did, and Gallegos and D.S. picked him up. While the three of
 them were hanging out, Gallegos told Mitchell about the plan
 to rob the victim, and Mitchell said that "he was down
 for it." The three then discussed the plan, which was
 "to roll down the window and just drive away with [the
 vaping products]; but if that didn't . . . work, then
 they had the gun to . . . pop out" and scare the victim.
 
 
          ¶9
 After J.S. finished working that day, Mitchell, Gallegos, and
 D.S. picked her up. The group then drove to the victim's
 house to carry out their plan. At this point, Gallegos was
 driving, J.S. sat in the front passenger's seat, and D.S.
 and Mitchell sat in the rear seats.
 
 6
 
          ¶10
 When the group arrived at the victim's home, J.S. texted
 him to let him know that she was there. The victim came out
 and walked to where J.S. was seated in the car. J.S. handed
 the victim some money, and Mitchell apparently got out of the
 car with the gun. The victim then started to walk back to the
 house, but Mitchell, who was holding the gun, confronted him.
 A struggle ensued, and the victim threw Mitchell to the
 grass. During the ongoing struggle, Mitchell shot the victim.
 The victim screamed and ran into his house, and Mitchell and
 the three others fled.
 
 
          ¶11
 A neighbor called the police to report shots fired, and the
 police responded to the scene. There, the police found the
 victim unconscious and bleeding just inside the doorway of
 his home with his grandmother and sister around him. The
 victim was transported to a hospital where he regained
 consciousness for a time. While in the emergency room, he was
 asked who shot him, and he twice said, "Kenny"
 (i.e., Gallegos). He was further asked what school Kenny
 attended, and he responded, "Cherokee Trail."
 Finally, he was asked whether Kenny was a senior. The victim
 shook his head and said, "He's a junior." The
 victim was then taken into surgery, but he did not survive.
 
 
          ¶12
 Notwithstanding the victim's assertion that
 "Kenny" had shot him, law enforcement officers
 developed substantial evidence indicating that Mitchell, not
 Gallegos, was the one who had shot the victim, as described
 above. Among other
 
 7
 
 things, J.S. and D.S. both spoke with the police and directly
 implicated Mitchell as the sole triggerman. In addition,
 Mitchell had sent his girlfriend a Snapchat message that
 said, "I did some stuff," with an attachment to a
 news article about the shooting. He then sent another message
 that said, "Shit didn't go as planned." And it
 appears that Mitchell was the one who ultimately disposed of
 the gun.
 
 
          ¶13
 In light of the foregoing events, the People direct filed
 charges against all four juveniles in district court. The
 charges against the four were for felony murder, aggravated
 robbery, and conspiracy to commit aggravated robbery. The
 People, however, subsequently refiled only the charges of
 aggravated robbery and conspiracy to commit aggravated
 robbery against J.S. and D.S. in juvenile court, in
 recognition of their cooperation with law enforcement. The
 People later extended plea offers to both J.S. and D.S., and
 both of them pleaded guilty to the aggravated robbery count
 and were sentenced to two years in the Division of Youth
 Services.
 
 
          ¶14
 For their part, Gallegos and Mitchell, the two Black
 participants, sought to have their cases likewise refiled in
 juvenile court, but the People refused, and these
 defendants' cases remained in district court, where they
 both faced possible prison terms of life with the possibility
 of parole after forty years.
 
 
          ¶15
 Mitchell then filed a motion to dismiss for selective
 prosecution, arguing that the disparate treatment between
 him, on the one hand, and the non-Black codefendants, J.S.
 and D.S., on the other, rose "to the level of a
 selective
 
 8
 
 prosecution based on race." In support of this argument,
 Mitchell acknowledged that to succeed on his selective
 prosecution claim, he was required to prove that "(1)
 the prosecutorial policy had a discriminatory effect and (2)
 it was motivated by a discriminatory purpose." He
 asserted that the prosecution's charging decisions had a
 discriminatory effect because the four juveniles were
 similarly situated, given that all four were equally culpable
 under a felony murder theory, but the People charged only the
 two Black defendants with that murder while transferring the
 non-Black codefendants' cases to juvenile court and then
 offering them plea deals not offered to the two Black
 defendants. He further argued that he had established the
 requisite discriminatory purpose by showing that his
 disparate treatment was consistent with national, state, and
 local trends showing that, "[s]tatistically, Black
 people are treated differently at all levels of the criminal
 justice system."
 
 
          ¶16
 The People responded that Mitchell had not shown either a
 discriminatory effect or discriminatory purpose.
 Specifically, the People argued that Mitchell had not shown
 that he was similarly situated to his non-Black codefendants
 for purposes of establishing a discriminatory effect because
 there was "massive factual distinction"
 between Mitchell's culpability and that of those
 codefendants. In particular, the People argued that Mitchell
 alone (1) "chose to continue the action of the robbery,
 once the victim stepped away from the . . . vehicle";
 (2) "chose to
 
 9
 
 arm himself with a handgun, step outside of the vehicle, and
 physically confront[] the victim"; (3) "fired the
 shot which killed the victim in this case, during the
 physical confrontation which he . . . started, to further the
 robbery"; and (4) "disposed of the handgun which he
 used to kill the victim in this case."
 
 
          ¶17
 As to discriminatory purpose, the People asserted that the
 withholding of a plea deal from Mitchell was not evidence of
 unequal treatment because the fact that some codefendants and
 not others are offered plea bargains happens routinely and
 does not, alone, satisfy a defendant's burden to succeed
 on a claim for dismissal. Regardless, here, in addition to
 the factual differences in the conduct committed by each of
 the codefendants, J.S. and D.S. "offered full proffers
 in cooperation with law enforcement in advance of
 any plea bargain being offered," thereby
 justifying differential treatment in plea negotiations.
 
 
          ¶18
 The trial court subsequently denied Mitchell's motion. In
 so ruling, the court reasoned that the evidence presented
 supported a finding that, regardless of the charges filed,
 Mitchell's role in the murder was significantly greater
 than that of J.S. and D.S. Specifically, the trial court
 noted that the evidence showed that Mitchell was the one who
 had actually shot and killed the victim. In the court's
 view, consideration of that fact alone sufficed to allow it
 to find that Mitchell was not similarly situated to the
 individuals who drove to the scene but did not otherwise
 participate in the robbery and murder. In addition, the court
 opined
 
 10
 
 that J.S. and D.S. had "each participated in proffers
 with the district attorney which included acknowledgment of
 their respective roles in the crime." In light of the
 foregoing, the court found that Mitchell was not similarly
 situated with his non-Black codefendants so as to show any
 discriminatory effect. Finally, the court concluded that the
 statistics on which Mitchell had relied did not establish
 discriminatory purpose on the part of the People.
 
 
          ¶19
 The case proceeded to trial, and a jury convicted Mitchell of
 felony murder, aggravated robbery, and conspiracy to commit
 aggravated robbery. The trial court subsequently sentenced
 him to a controlling term of life in prison with the
 possibility of parole after forty years.
 
 
          ¶20
 Mitchell appealed, arguing, as pertinent here, that the trial
 court had erred in denying his motion to dismiss based on
 selective prosecution due to his race. In his view, he had
 demonstrated both discriminatory effect (because all four
 codefendants had allegedly committed the same felony murder
 but the People had made plea offers only to the non-Black
 codefendants) and discriminatory purpose (based on
 statistical evidence purporting to show that Black juveniles
 are more likely to be prosecuted as adults in Arapahoe
 County). The division, however, affirmed, agreeing with the
 trial court that Mitchell was not similarly situated to J.S.
 and D.S. (for the reasons that the trial court had stated).
 People v. Mitchell, 2024 COA 7M, ¶¶ 25-28,
 52, 547 P.3d 412, 418-19, 423. In light of this
 determination,
 
 11
 
 the division did not reach the question of whether
 Mitchell's statistical evidence met the threshold for
 establishing the prosecution's discriminatory purpose.
 Id. at ¶ 29, 547 P.3d at 419.
 
 
          ¶21
 Mitchell petitioned this court for certiorari review, and we
 granted his petition.
 
 
          II.
 Analysis
 
 
          ¶22
 We begin by setting forth the applicable standard of review.
 We next discuss the law governing claims of selective
 prosecution. We then apply these legal principles to
 determine whether the division below erred in upholding the
 trial court's finding that Mitchell had not established a
 viable claim of selective prosecution.
 
 
          A.
 Standard of Review
 
 
          ¶23
 "A district court's denial of a motion to dismiss on
 the ground of selective prosecution involves both conclusions
 of law and findings of fact." United States v.
 Smith, 231 F.3d 800, 806 (11th Cir. 2000). We review a
 trial court's factual findings for clear error and its
 legal conclusions de novo. Martinez v. People, 2024
 CO 6M, ¶ 24, 542 P.3d 675, 681.
 
 
          B.
 Selective Prosecution Claims
 
 
          ¶24
 Prosecutors are afforded broad discretion in determining whom
 to prosecute and the charges to be brought. People v.
 MacFarland, 540 P.2d 1073, 1075 (Colo. 1975).
 
 12
 
 This discretion is, however, subject to constitutional
 limitations. United States v. Armstrong, 517 U.S.
 456, 464 (1996). As pertinent here, under equal protection
 principles, the decision whether to prosecute may not be
 based on illegitimate standards such as race, religion, or
 other arbitrary classifications. Id.; see also
 MacFarland, 540 P.2d at 1075 (noting that "[e]qual
 protection is not denied absent a showing that a prosecutor
 has exercised a policy of selectivity [in the enforcement of
 laws] based upon an unjustifiable standard such as race,
 religion or any other arbitrary classification").
 
 
          ¶25
 A selective prosecution claim asserts that a prosecutor has
 brought a charge against a defendant for a constitutionally
 forbidden reason. Armstrong, 517 U.S. at 463. To
 establish that a prosecutor has engaged in inappropriate
 selective prosecution, a defendant must present clear
 evidence showing that the applicable prosecutorial policy had
 a discriminatory effect and was motivated by a
 discriminatory purpose. Id. at 465.
 
 
          ¶26
 To establish a discriminatory effect, a defendant must
 generally produce some evidence that similarly situated
 individuals of other races could have been prosecuted but
 were not. Id. at 469. In this regard, the Supreme
 Court has recognized a number of legitimate factors that
 might motivate a prosecutor to bring particular charges
 against particular defendants. Id. at 465. These
 include "the strength of the case, the prosecution's
 general deterrence value, the
 
 13
 
 Government's enforcement priorities, and the case's
 relationship to the Government's overall enforcement
 plan." Id. (quoting Wayte v. United
 States, 470 U.S. 598, 607 (1985)).
 
 
          ¶27
 Applying these factors, courts have observed that differences
 in behaviors and the strength of the evidence may inform
 whether two defendants are dissimilarly situated so as to
 justify different prosecutorial treatment. See,
 e.g., Smith, 231 F.3d at 810 (defining a
 "similarly situated" person for selective
 prosecution purposes as "one who engaged in the same
 type of conduct, which means that the comparator committed
 the same basic crime in substantially the same manner as the
 defendant-so that any prosecution of that individual would
 have the same deterrence value and would be related in the
 same way to the Government's enforcement priorities and
 enforcement plan-and against whom the evidence was as strong
 or stronger than that against the defendant"); Keene
 v. Mitchell, 525 F.3d 461, 463-65 (6th Cir. 2008)
 (concluding that a capital murder defendant was not similarly
 situated to others of a different race involved in an
 allegedly factually similar murder because the evidence
 against the defendant was stronger than the evidence against
 one of the others, the defendant murdered more people than
 the others, and several of the others had cooperated with the
 prosecution).
 
 14
 
          ¶28
 To show that the prosecution was motivated by a
 discriminatory purpose, a defendant must show "more than
 intent as volition or intent as awareness of
 consequences." McCleskey v. Kemp, 481 U.S. 279,
 298 (1987) (quoting Pers. Adm'r v. Feeney, 442
 U.S. 256, 279 (1979)). The defendant must show that the
 prosecution "selected or reaffirmed a particular course
 of action at least in part 'because of,' not merely
 'in spite of,' its adverse effects upon an
 identifiable group." Id. (quoting
 Feeney, 442 U.S. at 279). Such evidence of
 discriminatory purpose may be either direct or
 circumstantial. United States v. DeBerry, 430 F.3d
 1294, 1299 (10th Cir. 2005).
 
 
          C.
 Application
 
 
          ¶29
 Having set forth these principles, we turn to the facts
 before us.
 
 
          ¶30
 Mitchell first contends that the division below erred in
 concluding that he had not shown a discriminatory effect. We
 are not persuaded.
 
 
          ¶31
 As noted above, to establish a discriminatory effect in a
 case like this, a defendant must generally produce some
 evidence that similarly situated individuals of other races
 could have been prosecuted but were not. Armstrong,
 517 U.S. at 469. To assess the prosecution's conduct in a
 given case, courts may consider, among other factors, the
 strength of the case and the prosecution's enforcement
 priorities and enforcement plan. Id. at 465.
 
 15
 
          ¶32
 Here, for several reasons, we conclude that Mitchell has not
 made the requisite showing.
 
 
          ¶33
 First and foremost, as the trial court found, Mitchell's
 role in the victim's murder was significantly greater
 than that of the non-Black codefendants. As noted above,
 Mitchell escalated the situation by confronting the victim
 with a loaded gun when the victim was walking away from the
 vehicle, and when the victim attempted to defend himself,
 Mitchell shot him in the chest. In contrast, neither D.S. nor
 J.S. did anything to escalate the robbery attempt in a way
 that resulted in the victim's death. For this reason
 alone, Mitchell was not similarly situated to them. See
 Smith, 231 F.3d at 810 (defining a "similarly
 situated" person for selective prosecution purposes as
 one who "committed the same basic crime in substantially
 the same manner as the defendant"); see also
 Keene, 525 F.3d at 462, 465 (concluding that a Black
 defendant was not similarly situated to his White codefendant
 because, unlike the defendant, the codefendant was not the
 "triggerman" in the course of any of the murders at
 issue).
 
 
          ¶34
 Second, the evidence against Mitchell was strong. As noted
 above, J.S. and D.S. both implicated Mitchell as the sole
 triggerman. In addition, Mitchell's Snapchat messages to
 his girlfriend the night of the shooting acknowledged that he
 had done "some stuff" and that the incident had not
 "go[ne] as planned," and
 
 16
 
 he attached a news article about the shooting. The evidence
 also showed that Mitchell was the one who ultimately disposed
 of the gun.
 
 
          ¶35
 Third, the People's decision to prioritize obtaining a
 murder conviction from the person who was directly
 responsible (and most culpable) for the victim's death
 was an appropriate enforcement strategy.
 
 
          ¶36
 Finally, given J.S.'s and D.S.'s more limited roles
 in the victim's murder and their willingness to admit
 their roles and to cooperate in the present prosecution, the
 People's decision to offer them plea deals and to rely on
 their testimony in bringing the victim's killer to
 justice was likewise an appropriate prosecutorial strategy.
 
 
          ¶37
 We are not persuaded otherwise by Mitchell's contention
 that he was similarly situated to his non-Black codefendants
 merely because they were all charged with felony murder at
 the inception of the case. "Determining whether a
 [defendant] is similarly situated to those not prosecuted
 [is] a fact-intensive and case-specific comparative
 inquiry," not a charge-specific one. Frederick
 Douglass Found., Inc. v. District of Columbia, 82 F.4th
 1122, 1138 (D.C. Cir. 2023). A defendant who shares a
 criminal charge with others cannot by virtue of the shared
 charge alone be said to be similarly situated with those
 others. In re United States, 397 F.3d 274, 285 (5th
 Cir. 2005); see also United States v. Wilson, 123
 F.4th 1021, 1028 (9th Cir. 2024)
 
 17
 
 ("To be similarly situated means more than merely
 committing the same crime in the same place.").
 
 
          ¶38
 We likewise are unpersuaded by Mitchell's assertion that
 the statistical evidence that he produced showing unequal
 treatment of Black adults and juveniles in United States and
 Colorado courts generally and in the Eighteenth Judicial
 District in particular established a discriminatory effect.
 Standalone statistical evidence, without a showing that those
 involved were similarly situated, seldom suffices to prove
 discriminatory effect. See Chavez v. Ill. State
 Police, 251 F.3d 612, 638 (7th Cir. 2001)
 ("[P]arties may not prove discrimination merely by
 providing the court with statistical analyses. The statistics
 proffered must address the crucial question of whether one
 class is being treated differently from another class that is
 otherwise similarly situated."); cf. United States
 v. Mesa-Roche, 288 F.Supp.2d 1172, 1187-88 (D.
 Kan. 2003) (noting the importance of statistical evidence in
 traffic stop cases because of the virtual impossibility of
 identifying similarly situated individuals who were not
 stopped).
 
 
          ¶39
 Here, Mitchell did not show how the statistics that he cited
 established that Black defendants were treated differently
 from similarly situated non-Black defendants.
 
 
          ¶40
 In this regard, Armstrong, 517 U.S. at 458-59, 470,
 is instructive. In Armstrong, the defendants were
 indicted in federal court for selling crack, and they
 
 18
 
 filed a motion for discovery or dismissal, alleging that they
 were selected for federal prosecution because they were
 Black. Id. at 458-59. In support of this motion, the
 defendants offered only an affidavit from a "Paralegal
 Specialist" with the Federal Public Defender's
 Office, asserting that in every one of the twenty-four cases
 in which clients of that office were charged under the same
 statute as the defendants, the client was Black. Id.
 at 459. Attached to this affidavit was a "study"
 listing the twenty-four defendants, their race, whether they
 were prosecuted for selling cocaine as well as crack, and
 each case's status. Id. The Court ultimately
 concluded that the study did not constitute some evidence to
 support a selective prosecution claim because it did not
 "identify individuals who were not Black and
 could have been prosecuted for the offenses for which [the
 defendants] were charged, but were not so prosecuted."
 Id. at 470 (emphasis added).
 
 
          ¶41
 In the matter before us, as was the case with the statistical
 evidence presented in Armstrong, Mitchell's
 statistical evidence did not demonstrate that any
 similarly situated non-Black person escaped
 prosecution for felony murder. Although Mitchell's
 statistical evidence focused on the disparate treatment
 experienced by Black adults and juveniles generally in courts
 throughout the United States, in Colorado, and in the
 Eighteenth Judicial District, the evidence did not include
 the facts underlying the cases involving non-Black
 defendants.
 
 19
 
 Nor did the evidence indicate the crimes charged in such
 cases or the result of those prosecutions. Without such
 information, we cannot determine whether these persons were
 similarly situated to Mitchell such that their disparate
 prosecutorial treatment was unjustified.
 
 
          ¶42
 For these reasons, we conclude that the division correctly
 determined that Mitchell was not similarly situated to J.S.
 and D.S. and that Mitchell therefore did not show the
 discriminatory effect necessary to support his selective
 prosecution claim.
 
 
          ¶43
 Even if Mitchell could argue that he produced some evidence
 of discriminatory effect, however, we would still conclude
 that he did not establish a right to dismissal based on
 selective prosecution because he did not show the requisite
 discriminatory purpose.
 
 
          ¶44
 Mitchell contends that he established such a purpose in three
 ways. First, he provided statistical evidence demonstrating
 the disproportionate rate at which Black juveniles are
 arrested, prosecuted as adults, and imprisoned in Colorado.
 Second, he relies on the People's decisions (1) to
 withhold a plea deal from him; (2) to question him at his
 reverse transfer hearing about his prior contacts with law
 enforcement; and (3) to emphasize at the reverse transfer
 hearing his individual culpability in the shooting but then
 to change course at trial and argue that it did not matter to
 the jury's decision that "nobody meant for anybody
 to die." Third,
 
 20
 
 Mitchell contends that the People were aware "that a
 conviction was more likely to enter against a Black juvenile
 over a non-Black juvenile in the 18th judicial district and
 that such a conviction would result in a prison sentence in
 adult court." In Mitchell's view, this knowledge
 motivated the People to treat him differently from his
 non-Black codefendants. Again, we are unpersuaded.
 
 
          ¶45
 As noted above, to establish the People's discriminatory
 purpose, Mitchell was required to introduce direct or
 circumstantial evidence that the People engaged in a
 particular course of conduct at least in part because
 of, not merely in spite of, its effect on Mitchell due
 to his race. See McCleskey, 481 U.S. at 298;
 DeBerry, 430 F.3d at 1299. He did not satisfy this
 burden here.
 
 
          ¶46
 With respect to Mitchell's proffered statistical
 evidence, for the same reasons that this evidence did not
 establish a discriminatory effect, it did not establish a
 discriminatory purpose. Moreover, Mitchell did not tie his
 general statistical evidence to the People's conduct in
 this case.
 
 
          ¶47
 With respect to the People's decision to offer plea deals
 to the non-Black codefendants and to withhold a similar offer
 from Mitchell, as noted above, Mitchell's role in the
 victim's murder was significantly greater than that of
 the non-Black defendants (he was the one who escalated the
 attempted robbery and then shot and killed the victim), and
 this alone warranted treating these participants differently.
 
 21
 
          ¶48
 With respect to the People's decision to question
 Mitchell at the reverse transfer hearing regarding his
 criminal history and his culpability for the murder at issue,
 as Mitchell acknowledges, inquiry into a juvenile's
 record, criminal history, and whether the juvenile used, or
 possessed and threatened to use, a deadly weapon in the
 commission of a delinquent act are factors that a court must
 consider in a reverse transfer hearing (a proceeding in which
 a juvenile whose case has been direct filed in district court
 petitions to have the case transferred to juvenile court).
 § 19-2.5-801(4)(b), C.R.S. (2025). Nor do we view the
 People's different approaches at the reverse transfer
 hearing and at trial as indicative of the People's
 discriminatory purpose. Instead, the People's approaches
 reflected the different issues before the court at the
 respective proceedings. As noted above, the reverse transfer
 hearing required the court to consider certain factors.
 See id. At trial, the prosecution's approach was
 guided by the elements of the offenses that it was trying to
 prove. And Mitchell himself acknowledges that for purposes of
 proving felony murder, it was immaterial whether any of the
 participants wanted the victim to die. See §
 18-3-102(1)(b), C.R.S. (2019) (setting forth the elements of
 felony murder at the time the crime at issue was committed);
 see also § 18-3-103(1)(b), C.R.S. (2025)
 (setting forth the current elements of felony murder).
 
 
          ¶49
 Finally, as to Mitchell's contention that the People knew
 that a conviction was more likely to enter against a Black
 juvenile over a non-Black juvenile in the
 
 22
 
 Eighteenth Judicial District and that such a conviction would
 result in a prison sentence if tried in the district court,
 Mitchell produced no evidence to support this assertion. Nor
 did he produce evidence to show that any such knowledge on
 the part of the People somehow influenced their prosecutorial
 decisions in this case, and we view such a logical leap as
 mere speculation.
 
 
          ¶50
 Accordingly, we conclude that even had Mitchell presented
 sufficient evidence of a discriminatory effect, he did not
 satisfy his burden of showing the requisite discriminatory
 purpose.
 
 
          III.
 Conclusion
 
 
          ¶51
 For these reasons, we conclude that Mitchell did not satisfy
 his burden of showing that the People's conduct in this
 case had a discriminatory effect and was motivated by a
 discriminatory purpose. Accordingly, we perceive no error in
 the division's decision to uphold the trial court's
 order denying Mitchell's motion to dismiss based on the
 People's alleged selective prosecution.
 
 
          ¶52
 We therefore affirm the division's judgment.